## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ORGANOGENESIS INC., a corporation,

                Plaintiff,

                v.

HEATHER GOLDSBY,

                Defendant.

Civil Action No.  24cv12470

**JURY TRIAL DEMANDED**

## VERIFIED COMPLAINT

1.      Organogenesis Inc. ("Organogenesis" or the "Company") brings this action to protect its good will, confidential information and trade secrets, enforce its Invention, Non-Disclosure and Non-Competition Agreement (the "Agreement"), recover damages from its former sales representative, Heather Goldsby ("Goldsby"), and enjoin further harm caused by Goldsby's violations of her contractual and legal duties.

2.      Organogenesis is a pioneer and commercial leader in the field of regenerative medicine.  The Company develops, manufactures, and sells regenerative products for advanced wound care and surgical and sports medicine.  Organogenesis sells its products across the United States and employs sales representatives in each of its sales territories.  The Company relies on its sales representatives to liaise with medical professionals, market its products, and be the face of the Company in their respective territories.  To protect its good will, trade secrets, and confidential information, including information about its customers, Organogenesis routinely enters into agreements with its sales representatives that prohibit them from, among other things, (1) engaging in business activity that is competitive with the Company while employed at the

1

Company and for a period of time after they leave the Company; (2) soliciting Organogenesis's customers while employed at the Company and for a period after they leave; and (3) misusing Organogenesis's confidential information and trade secrets, including, without limitation, customer purchase histories and preferences, customer practice patterns, and strategies for gaining business from customers and prospective customers.

3.      Goldsby was employed as a sales representative for Organogenesis for nearly eight years, from September 6, 2016 through July 8, 2024.  When she was hired, Goldsby agreed to and signed the Agreement, which specifically prohibits her during her employment and for one year thereafter from transacting business with and soliciting business from Organogenesis's customers, as well as engaging in business activities competitive with the Company.  The Agreement also prohibits her from misusing Organogenesis's confidential information.

4.      Goldsby blatantly violated the Agreement soon after she ended her employment with the Company.  Organogenesis recently learned that Goldsby has been soliciting the Company's customers in her former sales territory in clear violation of her Agreement.

5.      The Company discovered Goldsby's violations of her Agreement when several of its active customer accounts—formerly some of Goldsby's biggest accounts—informed Organogenesis that Goldsby had recently visited them as a sales representative and, in some cases, falsely represented herself as a current Organogenesis employee.  In addition, current Organogenesis customers have been communicating with Goldsby using her former Organogenesis email address—seemingly inadvertently or unknowingly—regarding her sales to them of products that compete with Organogenesis's products.  These communications show that Goldsby is working with or for a competitor and is misusing Organogenesis's confidential information in order to solicit these customers.

2

6.     Organogenesis's preliminary investigation of its losses as a result of Goldsby's conduct reveals that Goldsby's misuse of confidential information and breach of her Agreement's non-solicitation and non-competition provisions have cost the company hundreds of thousands of dollars in lost revenues.  Those losses, however, significantly underestimate the ongoing, and irreparable damage to Organogenesis's business:  Goldsby has damaged or will damage the Company's relationships with the top medical practices in her former sales territory by misrepresenting herself as an Organogenesis representative and/or using her knowledge of those customers' preferences and needs gained while at Organogenesis to sell them competing products and take business away from Organogenesis.  Those relationships are irreplaceable.

7.     Goldsby's conduct also directly harms current Organogenesis sales representatives serving Goldsby's former accounts by, at minimum, causing confusion for customers as to whom at Organogenesis they should rely upon for their wound graft needs, and at worst, diverting business from Organogenesis.

8.     Organogenesis therefore brings this action against Goldsby seeking preliminary and permanent injunctive relief, compensatory and punitive damages, and attorneys' fees and costs.

**THE PARTIES**

9.     Plaintiff Organogenesis Inc. is a Delaware corporation with its corporate headquarters and principal place of business in Canton, Massachusetts.  Organogenesis develops, manufactures, and sells regenerative products for advanced wound care and surgical and sports medicine.  Organogenesis sells its products across the United States and employs sales representatives in each of its sales territories.  The Company was founded in 1985 and has since grown its portfolio to include products such as Apligraf, a living cell-based product used to treat

3

diabetic foot ulcers and venous leg ulcers; PuraPly AM, a line of grafts for chronic and acute wound management; and placental derived human tissue allograft products like Affinity, NuShield, Novachor, and Cygnus Dual.  Organogenesis also provides its Physician Solutions service, a total advanced wound care product solution to help customers improve patient outcomes and office efficiency with management tools, high-quality wound care products, and on-demand support.

10.     Defendant Heather Goldsby is an individual and a citizen of the State of Oklahoma, residing in Edmond, Oklahoma.  She recently voluntarily resigned from her position as a Tissue Regeneration Specialist for Organogenesis.  From September 6, 2016 through July 8, 2024, Goldsby was a sales representative for the Company, spending almost all of that time as a Tissue Regeneration Specialist.  During her employment with Organogenesis, Goldsby was responsible for sales of all Organogenesis wound care products in the Oklahoma City North Territory, which included the cities of Oklahoma City and Edmond, among others.[1]

11.     Non-party New Horizons Medical Solutions is a distributor of medical products and patient care services located in Las Vegas, Nevada and serving medical practice customers nationwide.  On information and belief, New Horizons distributes products that compete with Organogenesis products.

12.     Non-party MTF Biologics is a non-profit organization headquartered in Edison, New Jersey that provides medical products and services across the United States and globally. Its Wound Care division produces products, including AmnioBand and AlloPatch, that compete directly with Organogenesis's products.

---

[1] In addition to Oklahoma City and Edmond, Goldsby's territory included the cities of Arcadia, Billings, Blackwell, Braman, Burbank, Coyle, Fairfax, Guthrie, Kaw City, Langston, Marland, Meridian, Morrison, Mulhall, Nardin, Newkirk, Orlando, Pawnee, Perry, Ponca City, Ralston, Red Rock, Shidler, and Tonkawa.

## JURISDICTION AND VENUE

13.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because

Plaintiff Organogenesis and Defendant Goldsby are citizens of different states and the amount in

controversy exceeds $75,000, exclusive of interests and costs.

14.      The Court has personal jurisdiction over Defendant Goldsby pursuant to M.G.L.

c. 223A, § 3 and the Due Process Clause of the Fourteenth Amendment.  Organogenesis is

located in Massachusetts, Goldsby regularly interacted with and relied upon Massachusetts-

based employees to conduct business on behalf of Organogenesis, and Massachusetts law

governs this dispute.

15.      Venue is proper in Massachusetts pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**Organogenesis's Investments in Product Innovation, Sales Strategies, and Training**

16.      Organogenesis has developed a comprehensive portfolio of advanced wound care

products that it markets to clinicians throughout the United States.  Its regenerative medical

products support patients throughout the process of wound healing.

17.      Apligraf, Organogenesis's bioengineered skin substitute, is comparable in

structure to human skin, with dermal and epidermal layers containing living skin cells. The

product stimulates wound healing by moving the patient's tissue from a chronic non-healing

state to an active healing state.  It is used to promote healing of venous leg ulcers and diabetic

foot ulcers.

18.      One of the premier brands in Organogenesis's portfolio is its PuraPly product

line, which was introduced to the market in 2016.  PuraPly works as a physical and antimicrobial

barrier to help prevent the accumulation of bacteria on a wound and support the healing process.

PuraPly comes in a variety of sizes and configurations to manage different wound types and works as an effective barrier to resist microbial colonization within the device and reduce microbes penetrating through the device.

19.     The PuraPly line of products represents approximately half of the Company's net revenue.

20.     Organogenesis's wound care offerings also include placental derived human tissue allograft products, including Affinity, NuShield, Novachor, and Cygnus Dual.  These products are produced from placentas donated by birthing mothers from their caesarean procedures.  These products function as a barrier to support the wound healing process and are intended for use on various types of wounds and anatomical locations.

21.     Affinity is comprised of the amnion layer of the placenta. It is a "fresh" product (not dehydrated or sterilized), retaining tissue elements such as viable cells, cytokines, growth factors, and matrix proteins—thus, preserving as closely as possible the native amniotic membrane.

22.     NuShield is comprised of the amnion, chorion, and spongy layers of the placenta. It is dehydrated and terminally sterilized, and the processing retains native proteins of the tissue, including cytokines, growth factors, and matrix proteins.

23.     Novachor is comprised of the chorion layer of the placenta.  It is a "fresh" product (not dehydrated or sterilized), retaining tissue elements such as viable cells, cytokines, growth factors, and matrix proteins—thus, preserving as closely as possible the native chorion membrane.

24.     Cygnus Dual is a dual-layered, dehydrated amniotic membrane product that retains native components of amniotic tissue such as viable cells, cytokines, growth factors, and matrix proteins to provide an optimal healing environment.

25.     Organogenesis's competitors also produce human placental allograft products. Competitors selling similar, competing products include, but are not limited to Amniox Medical, Inc. (amniotic allograft products) and MTF Biologics' Wound Care division ("MTF Wound Care") (AmnioBand and AlloPatch).

26.     Organogenesis also offers its customers a Physician Solutions service, which provides a total advanced wound care product solution to help customers improve patient outcomes and office efficiency with management tools, high-quality wound care products, and on-demand support.  This product is also marketed and sold to customers nationwide.

27.     Organogenesis markets its portfolio of products, including the PuraPly line; placental-based products like NuShield, Affinity, Novachor, and Cygnus Dual; and bioengineered skin substitutes like Apligraf, through territory-based medical sales representatives, who are known as Tissue Regeneration Specialists.

28.     Each Tissue Regeneration Specialist is assigned to a "territory" within a larger "region" of the United States and reports to a Regional Sales Manager.  Within their territories, the Tissue Regeneration Specialists serve as Organogenesis's primary points of contact with medical clinicians, customers who purchase Organogenesis's products, and prospective customers.

29.     Organogenesis relies on its Tissue Regeneration Specialists to develop and maintain strong relationships with medical clinicians and customers and to expand its clientele. To that end, the Company invests significant resources in training its Tissue Regeneration

Specialists.  Training for Tissue Regeneration Specialists typically consists of multiple phases, with each phase incorporating at-home and field training.

30.     Tissue Regeneration Specialists are provided with rigorous home study materials and accompanying assessments that cover topics ranging from the types of conditions that Organogenesis's products treat to key features that differentiate Organogenesis products from other products on the market.  Organogenesis also provides training on sales techniques, marketing, reimbursement, and compliance.

31.     Through their training and day-to-day work with customers, Tissue Regeneration Specialists have access to confidential information about Organogenesis's customer accounts and market intelligence, including, for example, customer preferences, purchase histories and patterns, competitive product utilization, practice patterns (*e.g.*, how clinicians utilize skin substitutes), and purchase power (*e.g.*, credit limits and other limitations).

**Goldsby Signs the Agreement as a Condition of Her Employment**

32.     One of the conditions of Goldsby's offer of employment at Organogenesis was her execution of the Agreement.  *See* <u>Exhibit 1</u>.  Goldsby's executed Agreement is incorporated herein by reference.[2]

33.     Goldsby agreed that for the term of her employment and for a period of one year thereafter, she would not (i) "attempt to interfere with or entice away any customer, licensee or employee or consultant of the Company;" or (ii) participate as a "salesperson or employee of any other business, firm or corporation which is, or by the action of Employee would become, competitive with the Business of the Company."  <u>Ex. 1</u>, § 2.2.

---

[2] Goldsby's Agreement was signed in August 2016 and predates the Massachusetts Noncompetition Agreement Act, G.L. c. 149, § 24L, which took effect on October 1, 2018.

34.     Amniox Medical, Inc. and MTF Wound Care, and their placental-based products, are specifically listed in the Agreement as competitive with Organogenesis's business.  *Id.* § 2.3.

35.     Goldsby also agreed not to misuse Organogenesis's confidential information, which includes, without limitation, confidential information relating "to the business of" the Company or any of its customers, as well as any "prospect or customer list."  *Id.* § 6.  The provision governing Goldsby's handling of Organogenesis's confidential information provides:

> Without prior written approval or except in connection with his or her specifically assigned duties, Employee agrees not to disclose, publicly or privately, to anyone outside of the Company, or use directly or indirectly for Employee's own benefit, during the period of his or her association with the Company, or any time thereafter, any . . . trade secret or confidential report or other confidential information . . . prospect or customer list . . . relating to the Business of the Company o[r] any of its prospects, customers, licensees or suppliers, regardless of how such Confidential Information was acquired or generated, until the same shall be published or otherwise made generally available to the public without restriction.

*Id.*

36.     Goldsby acknowledged that these restrictions were reasonable and that her breach of any of these obligations would "likely result in irreparable injury to the Company."  *Id.* § 8.

37.     Organogenesis and Goldsby agreed that the Agreement would be governed by Massachusetts law.  *Id.* § 11.

**Goldsby's Role at Organogenesis**

38.     Goldsby began working for Organogenesis on September 6, 2016.  During the entirety of her employment, Goldsby received an annual salary and was also eligible to receive incentive bonuses and commission.

39.     Goldsby was hired as a Tissue Regeneration Associate—the Company's entry level sales representative position—and was quickly promoted in 2017 to Tissue Regeneration

Specialist ("TRS").  This promotion reflected greater account responsibility rather than a material change in Goldsby's role or responsibilities.

40.     Goldsby participated in the standard TRS training and orientation during which Organogenesis provided Goldsby with confidential information concerning, among other things, its customers and sales.

41.     Goldsby was assigned to the Oklahoma City North Territory, and she remained the TRS for the Oklahoma City North Territory for the course of her tenure with Organogenesis. For nearly eight years, Goldsby was the primary face of Organogenesis in the Oklahoma City North Territory.

42.     Goldsby marketed Organogenesis's entire line of wound care products, including Apligraf, the PuraPly products, and the Company's human placental allograft tissue products Affinity, NuShield, Novachor, and Cygnus Dual.

43.     Goldsby was one of the top performing TRSs in the country.  She consistently maintained an above-average number of active accounts and was one of the first TRSs in Oklahoma to develop relationships with and sell Organogenesis products to dermatology practices.

44.     Goldsby was so successful that Organogenesis recognized her outstanding performance with its Circle of Excellence award for top sales representative on multiple occasions.

45.     In her role, Goldsby had access to and regularly utilized confidential information about Organogenesis's customer accounts and prospective customers in the Oklahoma City North Territory and the Central Area, the larger sales region within which her territory was located.  This confidential information included market intelligence such as customer

preferences, purchase histories and patterns, competitive product utilization, practice patterns (*e.g.*, how clinicians utilize skin substitutes), and purchase power (*e.g.*, credit limits and other limitations).

46.     At Organogenesis, TRSs are encouraged to engage in collaborative efforts aimed at enhancing sales performance and operational effectiveness. These efforts typically involve discussions related to account management, strategies for reaching prospective customers, and best practices for optimizing sales within existing accounts. While this collaboration primarily occurs within the respective sales regions, which are composed of multiple territories, the geographical configuration of the two regions in Oklahoma led to cross-regional collaboration. As a result, although Goldsby was primarily responsible for sales in the Oklahoma City North Territory, she regularly communicated with Organogenesis representatives across the Central Area regarding account management and client relations.

47.     With the advice of her colleagues and under the tutelage of her supervisors, Goldsby developed strong relationships with some of the largest medical practices in the Central Area.  Her relationships bore fruit for Organogenesis, and she generated large, recurring orders from customers such as Skin Surgery Center of Oklahoma, Dermatology Associates of Edmond, SSM Dermatology, and Summit Medical Center.

48.     Notwithstanding these successes, during the latter part of her tenure with the Company, Goldsby was criticized for overly-aggressive sales efforts to benefit herself rather than the Company.

49.     In March 2023, the Company learned that Goldsby had, on multiple occasions, reached out to customers outside of her territory despite knowing the existing alignments and business partnerships.  As a result, Organogenesis representatives and management had to spend

11

unnecessary and excessive time mitigating the damage done to the business relationships with which Goldsby had interfered.

50.     Goldsby was instructed not to solicit or accept any information that was not directly related to the Oklahoma City North Territory and to follow the proper chain of command.

### Goldsby Resigns from Organogenesis

51.     On June 24, 2024, Goldsby gave Organogenesis official notice of her resignation.

52.     The same day, Abbey Lawson, the Company's Area Director of Sales, Central Region, spoke with Goldsby by telephone to wish her well and thank her for her contributions to the Company.  Lawson asked Goldsby to meet with her to discuss active patients and relevant hand-off information for all of her account to ensure continuity of service for Goldsby's accounts.

53.     On June 25, 2024, Lawson and Goldsby met in Edmond.  They discussed all of her active accounts, including active patients, key account relationships, and contact information for the account decisionmakers.

54.     On June 25, 2024, Organogenesis sent Goldsby an exit letter detailing the terms of her separation.  A true and correct copy of the exit letter is attached hereto as Exhibit 2.  Goldsby's exit letter explicitly reminded her that he was bound by the Agreement and required to "abide by any and all common law and/or statutory obligations relating to protection and non-disclosure of the Company's trade secrets and/or confidential and proprietary documents and information."  It also attached a copy of the Agreement for her reference.

55.     The exit letter also instructed Goldsby to "to return all Company documents (and any copies thereof whether in hard or electronic form), property (including, without limitation,

keys, computers, iPads, computer disks and CD-ROMs, USB storage devices, pagers, phones and credit cards) and transfer any other Company information (including documents, files, etc.) within five (5) business days of termination."

56.     As of the date of the filing of this Complaint, Goldsby had not returned her Company iPad or transferred any Organogenesis-provided credentials back to the Company.

57.     Goldsby's employment terminated effective July 8, 2024 and her last paycheck issued on July 12, 2024.

58.     Following Goldsby's resignation, her accounts were realigned to other TRSs within the Central Area.

**Goldsby Violates Her Agreement By Soliciting Organogenesis's Customers**

59.     Since her resignation, Goldsby has been soliciting her former accounts for business and, in some cases, misleadingly representing herself as a current employee of Organogenesis.  Such attempts to entice away customers are in direct contravention of the non-solicitation provision in her Agreement.

60.     Organogenesis first discovered Goldsby's violative conduct via an email from a current Organogenesis customer, Skin Surgery Center of Oklahoma ("Skin Surgery Center"), sent to Goldsby's former Organogenesis email address.

61.     To maintain customer relationships and ensure a smooth transition following Goldsby's resignation, Goldsby's former Regional Sales Manager, Vincent Hayes ("Hayes"), has continued to monitor emails sent to Goldsby's Organogenesis email address.

62.     On July 22, 2024, less than a month after her departure, Hayes received a calendar invitation from Skin Surgery Center that was forwarded to Goldsby's former email address.

63.     Goldsby had worked with Skin Surgery Center for nearly five years as an Organogenesis TRS, and Skin Surgery Center was one of the largest customers in her territory.

64.     Skin Surgery Center continues to be an active account for Organogenesis and a new TRS has been assigned to it.

65.     The calendar invitation was for an upcoming lunch meeting organized by Goldsby and New Horizons Medical Solutions ("New Horizons"), a large distributor of products that compete with Organogenesis's products, including the products Goldsby sold.  Skin Surgery Center's Practice Manager, who was invited to the lunch forwarded the invitation to a colleague and copied Goldsby, seemingly for visibility as the event organizer.

66.     The calendar invitation sent to Skin Surgery Center included the text of a message from Goldsby to New Horizons, describing Skin Surgery Center's work and what type of services and products would be most useful to it.

67.     Goldsby was able to provide this information to New Horizons only due to her experience with Skin Surgery Center as a customer of Organogenesis and the knowledge she gained as an Organogenesis TRS.

68.     On information and belief, Goldsby is now employed by and/or providing services for Organogenesis's competitor, New Horizons.

69.     On information and belief, Skin Surgery Center was interested in working with New Horizons because of the relationship Goldsby built with them while employed by Organogenesis.

70.     Goldsby has called on Skin Surgery Center on at least two other occasions.  On September 13, 2024, Camille Pritchard, the current Organogenesis TRS assigned to Skin Surgery

14

Center, saw Goldsby in the patient area at Skin Surgery Center.  Although Goldsby and Pritchard made eye contact, they did not speak.

71.     On September 17, 2024, Pritchard saw Goldsby at Skin Surgery Center again and again did not speak with her.

72.     On this occasion, Pritchard was calling on Skin Surgery Center prepared for two patient applications of Organogenesis's PuraPly products.

73.     A Skin Surgery Center nurse brought a collagen skin substitute product called Helicoll to Pritchard and asked her if she was there for the patient application of Helicoll.

74.     Helicoll is a product that competes with Organogenesis's PuraPly products and, according to New Horizon's website, is marketed and sold by New Horizons.

75.     Pritchard told the nurse that Helicoll was not an Organogenesis product.  The nurse apologized and stated that she had mistaken Pritchard for Goldsby.  The nurse then informed Pritchard that they would be applying Helicoll instead of PuraPly.

76.     Based on this interaction between Pritchard and the Skin Surgery Center nurse and Goldsby's appearances at Skin Surgery Center, Organogenesis believes that Goldsby has visited her former account, Skin Surgery Center on more than one occasion and that she has taken business from Organogenesis by selling Skin Surgery Center a competing product, Helicoll.

77.     Skin Surgery Center is not the only Organogenesis customer with whom Goldsby has interfered since her departure from the Company.

78.     On August 27, 2024, a new Organogenesis TRS visited one of Goldsby's former accounts, Dermatology Associates of Edmond ("Dermatology Associates").  When the staff greeted him, they exclaimed that they had seen two Organogenesis representatives in one week.

The Organogenesis employee inquired as to what they meant, and the staff stated that Goldsby had visited them just days before and represented to them that she was selling a new Organogenesis product.  At that point, the Organogenesis employee explained that Goldsby was no longer with the Company and had not been for nearly two months.  The Dermatology Associates employees expressed their shock that Goldsby had not told them about her departure from Organogenesis, as they saw her frequently.

79.     Organogenesis also has been informed by another customer, SSM Dermatology, that Goldsby calls on SSM Dermatology on a regular basis, and they were unaware that she and her new product were not affiliated with Organogenesis.

80.     Both Dermatology Associates and SSM Dermatology are active Organogenesis accounts that were formerly assigned to Goldsby.

81.     On September 4, 2024, Hayes received another email to Goldsby's Organogenesis email address from one of Goldsby's former accounts, Summit Medical Center.  In the email, Summit Medical Center was informing Goldsby of patient applications of AmnioBand and AlloPatch.

82.     AmnioBand and AlloPatch are two amniotic products produced by MTF Wound Care that compete with those of Organogenesis.  MTF Wound Care is explicitly identified in Goldsby's Agreement as an Organogenesis competitor and their products AmnioBand and AlloPatch are described as competing products.  Ex. 1, § 2.3.8.

83.     On information and belief, Goldsby is now employed by and/or providing services for Organogenesis's competitor, MTF Wound Care, or working for a distributor that sells MTF Wound Care's competing products.

84.     On information and belief, Goldsby is now selling competing products, including but not limited to AmnioBand and AlloPatch, to her former account, Summit Medical Center. These sales directly harm Organogenesis's business and violate her Agreement.

85.     Organogenesis also believes that Goldsby is continuing to use her Organogenesis credentials to gain access to patient care areas at her former Organogenesis accounts.

86.     Specifically, on September 13, 2024, Hayes received an email from IntelliCentrics, a vendor credentialling system used by, among others, Goldsby's former account OU Health Edmond.  The email was a reminder to all vendors regarding proper check in and check out procedures.

87.     Goldsby had OU Health Edmond in her territory for the entirety of her career. While employed by Organogenesis, Goldsby registered for IntelliCentrics credentials using her Organogenesis email address in order to access patient care areas at OU Health Edmond.  The credentials must be renewed annually.  Goldsby last requested reimbursement from the Company for IntelliCentrics credentials on March 1, 2024.

88.     Upon learning that Goldsby's IntelliCentrics credentials may still be active, Organogenesis asked IntelliCentrics to remove Organogenesis from her credentials.

89.     On information and belief, Goldsby is continuing to use her Organogenesis credentials to access patient care areas at OU Health Edmond and thereby representing herself as a current Organogenesis representative.

90.     On information and belief, Goldsby is using her Organogenesis credentials to solicit business for herself and/or her new employer.

**COUNT I**

**Breach of Contract –Non-Solicitation Clause**

91.     Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

92.     Goldsby is subject to the validly formed Agreement.  The Agreement prohibits Goldsby during "the term of her . . . association with" Organogenesis and for "a period of one year thereafter" from, *inter alia*, "interfere[ing] with or entic[ing] away any customer . . . of the Company."  Ex. 1, § 2.  She is further prohibited from engaging as a "salesperson or employee of any other business, firm or corporation which is, or by the action of [Goldsby] would become, competitive with the Business of the Company" during her employment and for one year thereafter.  *Id.*

93.     Since the termination of her employment on July 8, 2024, Goldsby has called on at least four former accounts, all of which are active customers of Organogenesis.

94.     In some instances, Goldsby has falsely represented herself as a current employee of Organogenesis.

95.     Goldsby has systematically targeted Organogenesis's customers, and, on information and belief, has succeeded in selling them wound care products that are competitive with Organogenesis products, including but not limited to Helicoll, AmnioBand and AlloPatch.

96.     Any success Goldsby has had in selling competing products to her former accounts is a direct result of the relationships she built with those clients while employed by Organogenesis.

97.     Goldsby's actions have already caused Organogenesis's customers to reduce their purchases from Organogenesis and impacted their relationships with Organogenesis.  Goldsby's

18

actions also confuse customers as to which products Organogenesis sells and who their sales representative is.

98.     As a direct and proximate result of Goldsby's breach of the Agreement, Organogenesis has suffered and continues to suffer harm, including, without limitation, to its customer good will and lost revenue and profits.

**COUNT II**
**Breach of Contract – Misuse of Confidential Information**

99.     Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

100.    Goldsby is subject to the validly formed Agreement.  The Agreement prohibits Goldsby from, *inter alia*, "us[ing] directly or indirectly for [her] own benefit, during the period of her . . . association with the Company, or any time thereafter, any . . . trade secret or . . . confidential information" that belongs to Organogenesis.  Ex. 1, § 6. Confidential information includes, without limitation, "prospect or customer list[s]" and closely guarded information about Organogenesis's customers and their purchase histories and preferences.  *Id.*

101.    Following her departure from the Company, Goldsby misused Organogenesis's confidential information, including, without limitation, customers' purchase histories and patterns, customer preferences, and strategies for gaining business from customers and prospective customers, for her own personal benefit and the benefit of the Company's competitors.  She used confidential information about Organogenesis's customers to sell and attempt to sell wound care products that are competitive to Organogenesis's products to Organogenesis's existing and prospective customers.

102.    On information and belief, Goldsby has also disclosed Organogenesis's confidential information, including, without limitation, customers' purchase histories and

19

patterns, customers' preferences, and customer-specific sales strategies, to the Company's direct competitors, including New Horizons and/or MTF Wound Care.

103.    As a direct and proximate result of Goldsby's breach of the Agreement, Organogenesis has suffered and continues to suffer harm, including, without limitation, to its customer good will and lost revenue and profits.

## COUNT III
## Misappropriation of Trade Secrets (M.G.L. c. 93, § 42)

104.    Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

105.    Through her employment with Organogenesis, Goldsby received access to Organogenesis's trade secrets, including, without limitation, customers' purchase histories and patterns, customers' preferences, contact information for key decisionmakers at customer accounts, strategies for gaining business from customers and prospective customers, and other forms of information that are not publicly available.

106.    Organogenesis has taken great efforts to keep this information secret. Organogenesis's efforts include but are not limited to restricting electronic access to such confidential information to employees that have a business reason to access the information and requiring employees with access to the information to sign non-disclosure agreements and restrictive covenants.  Confidential information concerning the Oklahoma City North Territory covered by Goldsby was only accessible to Goldsby, her supervisors, and a few executives with responsibilities for overseeing the Company's sales organization.

107.    Organogenesis has expended significant time, expense, and resources developing and protecting information on its markets and customers.  This information is highly valuable to Organogenesis and to its competitive advantage in the market.

108.    Organogenesis's confidential information, including, without limitation, customer purchase histories and patterns, customer preferences, and strategies for gaining business from customers and prospective customers, constitute trade secrets within the meaning of the Massachusetts Uniform Trade Secrets Act (M.G.L. c. 93, §§ 42-42G).

109.    Organogenesis's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

110.    Goldsby is obligated under the Agreement to maintain the secrecy of Organogenesis's confidential information.

111.    Goldsby misappropriated Organogenesis's trade secrets when she used those trade secrets to sell and attempt to sell competitive wound care products to Organogenesis's customers and prospective customers for her own personal gain.

112.    Goldsby failed to return her Company iPad upon her resignation which, on information and belief, contains the Company's confidential information.

113.    On information and belief, Goldsby has also used and disclosed Organogenesis's confidential information for the benefit of New Horizons and/or MTF Wound Care, direct competitors of the Company.

114.    As a direct and proximate result of Goldsby's misappropriation, Organogenesis has suffered and continues to substantial suffer harm, including but not limited to the loss of business and loss of reputation and good will.

115.    Organogenesis is entitled to actual damages pursuant to M.G.L. c. 93, § 42B.

116.    Goldsby's conduct was willful and/or malicious, entitling Organogenesis to exemplary damages pursuant to M.G.L. c. 93, § 42B(b).

21

## COUNT IV

### Misappropriation of Trade Secrets Under the
### Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836)

117.    Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

118.    Organogenesis is a Massachusetts-headquartered company that sells its products through interstate commerce across the United States through sales representatives located in each of its sales territories.

119.    Through her employment with Organogenesis, Goldsby received access to Organogenesis's trade secrets, including, without limitation, customers' purchase histories and patterns, customers' preferences, strategies for gaining business from customers and prospective customers, and other forms of information that are not publicly available.

120.    Organogenesis has taken great efforts to keep this information secret. Organogenesis's efforts include but are not limited to restricting access to such confidential information to its employees that have a business reason to access the information and requiring employees with access to the information to sign non-disclosure agreements and restrictive covenants.  Confidential information concerning the Oklahoma City North Territory covered by Goldsby was only accessible to Goldsby, her supervisors, and a few executives with responsibilities for overseeing the Company's sales organization.

121.    The Agreement requires Goldsby to maintain the secrecy of Organogenesis's confidential information.

122.    Organogenesis has expended significant time, expense, and resources developing and protecting information on its customers.  This information is highly valuable to Organogenesis and to its competitive advantage in the market.

22

123.     Organogenesis's confidential information, including, without limitation, customer purchase histories and patterns, customer preferences, and strategies for gaining business from customers and prospective customers, constitute trade secrets within the meaning of the Defend Trade Secrets Act (18 U.S.C. § 1839(3).

124.     Organogenesis's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

125.     Goldsby misappropriated Organogenesis's trade secrets when she used those trade secrets to sell and attempt to sell competitive wound care products to Organogenesis's customers and prospective customers for her own personal gain.

126.     On information and belief, Goldsby has also used and disclosed Organogenesis's confidential information for the benefit of New Horizons and/or MTF Wound Care, direct competitors of the Company.

127.     As a direct and proximate result of Goldsby's misappropriation, Organogenesis has suffered and continues to suffer substantial harm, including but not limited to loss of business and customers and loss of reputation and good will.

128.     Organogenesis is entitled to actual damages pursuant to 18 U.S.C. § 1836(b)(3)(B)—including but not limited to the lost profits caused by Goldsby's misappropriation and unjust enrichment, including disgorgement of all compensation or other value that she received, in any form— in an amount exceeding $75,000 and to be proven at trial.

129.     Goldsby's conduct was willful and/or malicious, entitling Organogenesis to exemplary damages and attorney's fees pursuant to 18 U.S.C. §1836(b)(3)(C) and (D).

**COUNT V**

**Tortious Interference with Business Relations**

130.    Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

131.    Organogenesis has long-standing and significant business relationships with its existing customers in the Oklahoma City North Territory, including, without limitation Skin Surgery Center, Dermatology Associates, SSM Dermatology, and Summit Medical Center, and with prospective customers in the same territory.  These relationships include customers who make or would make multiple, repeat purchases of wound care products from Organogenesis, and as such, are or are likely to be very profitable for Organogenesis.

132.    On information and belief, Goldsby, acting on behalf of herself and/or on behalf of New Horizons or MTF Wound Care, willfully and intentionally interfered with Organogenesis's existing and prospective business relationships in her former territory, Oklahoma City North, through improper motive or means by soliciting Organogenesis's customers in the Oklahoma City North Territory in violation of her contractual obligations to the Company.  On information and belief, Goldsby also used Organogenesis's confidential information to pursue Organogenesis's customers and entice them away from Organogenesis.

133.    On information and belief, Goldsby has also used Organogenesis's confidential information to assist the Company's competitor, MTF Wound Care, in selling wound care products to Organogenesis's existing and prospective customers.

134.    As a direct and proximate result of Goldsby's conduct, Organogenesis has suffered and continues to suffer damages in form of lost revenues from ongoing and future business with existing and prospective customers.

24

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Organogenesis respectfully requests that this Court grant the following relief:

A.  Enter judgment for Organogenesis against Defendant on all counts of this Complaint;

B.  Award Organogenesis compensatory and exemplary damages in an amount to be determined at trial;

C.  Preliminarily and permanently enjoin Defendant from using Organogenesis's confidential information and trade secrets;

D.  Preliminarily and permanently enjoin Defendant from violating any of the provisions of the Agreement, including the non-solicitation and non-competition provisions;

E.  Toll the enforcement period of the Agreement for the period that Defendant was not in compliance with the non-solicitation and non-competition provisions of the Agreement;

F.  Award Organogenesis's attorneys' fees, costs, and expenses in the action; and

G.  Grant any such other and additional relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff Organogenesis demands a trial by jury on all claims so triable.

Dated:  September 26, 2024                    Respectfully submitted by,

                                              ORGANOGENESIS INC.,

                                              By and through its attorneys,

                                              */s/ Michael L. Rosen*
                                              Michael L. Rosen, BBO No. 559954
                                              Laura D. Gradel, BBO No. 692315
                                              FOLEY HOAG LLP
                                              155 Seaport Boulevard
                                              Boston, MA 02210-2600
                                              mrosen@foleyhoag.com
                                              lgradel@foleyhoag.com
                                              Tel: 617-832-1000
                                              Fax: 617-832-7000

## **VERIFICATION**

I, Brian Grow, hereby certify that I have reading the foregoing Verified Complaint; that the factual allegations made therein are true based on my own personal knowledge, except those stated to be made on information and belief, and as to those I believe them to be true; and that no material facts have been omitted; and that any exhibits submitted are true and correct copies.

Signed under the pains and penalties of perjury this 26th day of September, 2024.

*/s/ Brian Grow_____*
*Brian Grow*
*Chief Commercial Officer*
*Organogenesis*