# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

ORGANOGENESIS INC., a corporation,

Plaintiff,

v.

HEATHER GOLDSBY,

Defendant.

Civil No.  24cv12470

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND <u>PRELIMINARY INJUNCTION</u>

Michael L. Rosen, BBO No. 559954
Laura D. Gradel, BBO No. 692315
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
mrosen@foleyhoag.com
lgradel@foleyhoag.com
Tel: 617-832-1000
Fax: 617-832-7000
*Counsel for Organogenesis Inc.*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 2

    I.     Organogenesis's Investments in Product Innovation, Sales Strategies, and
          Sales Representative Training .............................................................................. 2

    II.    Goldsby Signs the Agreement as a Condition of Her Employment. ..................... 4

    III.   Goldsby's Tenure at Organogenesis. ................................................................... 5

    IV.   Goldsby Resigns and Immediately Violates Her Agreement. ............................... 7

ARGUMENT .................................................................................................................. 10

    I.     Organogenesis is Likely to Succeed on the Merits of its Claims. ...................... 11

          A.    Breach of Contract ................................................................................. 11

          B.    Trade Secret Misappropriation ............................................................... 14

    II.    Organogenesis Will Suffer Immediate Irreparable Harm if Goldsby Is Not
          Enjoined and Continues to Solicit Organogenesis's Customers. .......................... 16

    III.   The Balance of Equities Favors Granting Organogenesis's Requested Relief. ...... 19

    IV     The Public Interest Would be Served by Enjoining Goldsby and Protecting
          Organogenesis's Contract Rights. ........................................................................ 19

CONCLUSION ............................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.R.S. Servs. v. Baker*,
2012 Mass. Super. LEXIS 43 (Mass. Super. Feb. 21, 2012) ...................................................7

*Alexander & Alexander, Inc. v. Danahy*,
21 Mass. App. Ct. 488 (1986).................................................................................................19

*Bio-Imaging Techs., Inc. v. Marchant*
584 F. Supp. 2d 322 (D. Mass. September 24, 2008)..............................................................20

*Boathouse Group, Inc. v. TigerLogic Corp.*,
777 F. Supp. 2d 243 (D. Mass. 2011) .....................................................................................11

*Boulanger v. Dunkin' Donuts Inc.*,
815 N.E.2d 572 (Mass. 2004) ...........................................................................................12, 13

*Corporate Techs., Inc. v. Harnett ("Harnett I")*,
943 F. Supp. 2d 233 (D. Mass. 2013) ...............................................................13, 17, 19, 20

*Corporate Techs., Inc. v. Harnett ("Harnett II")*,
731 F.3d 6 (1st Cir. 2013).................................................................................................11, 12

*EMC Corp. v. Arturi*,
2010 U.S. Dist. LEXIS 132621 (D. Mass. Dec. 15, 2010) .....................................................19

*EMC Corp. v. Clesle*,
2016 Mass. Super. LEXIS 124 (Mass. Super. May 13, 2016)................................................13

*EMC Corp. v. Pure Storage, Inc.*,
2016 U.S. Dist. LEXIS 189511 (D. Mass. Aug. 19, 2016).....................................................14

*Ethicon Endo-Surgery, Inc. v. Pemberton*,
2010 Mass. Super. LEXIS 314 (Mass. Super. Ct. 2010) ........................................................11

*G&L Plumbing, Inc. v. Kibbe*,
699 F. Supp. 3d 96 (D. Mass. 2023) ................................................................14, 15, 16, 20

*Get in Shape Franchise, Inc. v. TFL Fishers, LLC*,
167 F. Supp. 3d 173 (D. Mass. 2016) .....................................................................................11

*Lombard Med. Techs., Inc. v. Johannessen*,
729 F. Supp. 2d 432 (D. Mass. 2010) .....................................................................................20

*Maine Educ. Ass'n Benefits Trust v. Cioppa*,
   695 F.3d 145 (1st Cir. 2012) ................................................................11

*Marcam Corp. v. Orchard*,
   885 F. Supp. 294 (D. Mass. 1995) ........................................................17

*Marine Contractors Co. v. Hurley*,
   365 Mass. 280 (1974) ...........................................................................13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dewey*,
   *2004 Mass. Super. LEXIS 222 (2004)*.................................................17

*New Comm Wireless Servs. v. Sprintcom, Inc.*,
   287 F.3d 1 (1st Cir. 2002) ....................................................................11

*New Eng. Controls, Inc. v. Pilsbury*,
   2018 U.S. Dist. LEXIS 107489 (D. Mass. June 27, 2018) ...................12, 13, 18, 20

*Optos, Inc. v. Topcon Med. Sys.*,
   777 F. Supp. 2d 217 (D. Mass. 2011) ..................................................15, 18

*Salomon Smith Barney, Inc. v. Barcomb*,
   2003 Mass. App. LEXIS 1497 (Mass. App. Ct. Jan. 3, 2003)............18, 19

*Schwabel Corp. v. Conair Corp.*,
   122 F. Supp. 2d 71 (D. Mass. 2000) .....................................................18

*Shipley Co. L.L.C. v. Kozlowski*,
   926 F. Supp. 28 (D. Mass. 1996) ..........................................................19

*Spalding & Evenflo Cos. v. Acushnet Co.*,
   1986 U.S. Dist. LEXIS 17129 (D. Mass. Nov. 28, 1986).....................18

**Statutes**

18 U.S.C. § 1836(b)(1) ................................................................................14

18 U.S.C. §§ 1836 *et seq.*...........................................................................14

M.G.L. c. 93 §§ 42-42G...............................................................................14

**Other Authorities**

New Horizon Medical Solutions, https://nhmedical.com/services-
   products/skin-substitutes/ (last visited Sept. 19, 2024).........................9

# INTRODUCTION

Defendant Heather Goldsby ("Goldsby") was, until recently, a successful sales representative for Plaintiff Organogenesis, Inc, ("Organogenesis" or the "Company"). As a Tissue Regeneration Specialist, Goldsby was the face of the Company for prospective and current customers in her assigned territory, which included Oklahoma City, Edmond, and neighboring cities. She marketed and sold Organogenesis's full line of advanced wound care products and, accordingly, had access to and knowledge of Organogenesis's confidential information including customer preferences, purchasing history, and market strategies. At the time of her hire, Goldsby entered into an Invention, Non-Disclosure and Non-Competition Agreement (the "Agreement"), to protect Organogenesis's good will, trade secrets, and confidential information, including information about its customers. The Agreement prohibits Goldsby from, among other things, (1) engaging in business activity that is competitive with the Company while employed at the Company and for one year after she leaves the Company; (2) soliciting Organogenesis's customers while employed at the Company and for one year after she leaves; and (3) misusing Organogenesis's confidential information.

As described more fully below, Organogenesis has learned that Goldsby, upon her recent resignation from the Company, immediately began calling upon the same customers that she serviced in her former Organogenesis territory, selling products that are competitive with the products she sold for Organogenesis. Goldsby's conduct violates her Agreement and has caused Organogenesis irreparable harm, which will continue absent immediate injunctive relief.

For these reasons, Organogenesis requests that the Court (1) enter a temporary restraining order enjoining Goldsby and anyone acting in concert with her from engaging in any business in her former Organogenesis sales territory that is competitive with Organogenesis, and from soliciting Organogenesis's customers in her former Organogenesis sales territory on behalf of

herself and/or a competitive business; and (2) enter a preliminary injunction enjoining Goldsby

from engaging in this conduct for at least one year.

## FACTUAL BACKGROUND

**I.      Organogenesis's Investments in Product Innovation, Sales Strategies, and
         Sales Representative Training**

Organogenesis is a pioneer and commercial leader in the field of regenerative medicine.

Verified Complaint (hereinafter, "Compl.") ¶ 2.  A Massachusetts-headquartered company,

Organogenesis develops, manufactures, and sells some of the leading regenerative products for

advanced wound care and surgical and sports medicine in the world.  *Id*. ¶¶ 2, 9.  Since its

founding in 1985, Organogenesis has grown its portfolio to include products such as Apligraf, a

bioengineered skin substitute used to treat diabetic foot and venous leg ulcers; PuraPly,

Organogenesis's line of grafts for chronic and acute wound management; and placental derived

human tissue allograft products like Affinity, NuShield, Novachor, and Cygnus Dual.  *Id*. ¶ 9.

Organogenesis also offers its customers a Physician Solutions service, which provides customers

a total advanced wound care product solution to improve patient outcomes and office

efficiency with management tools, high-quality wound care products, and on-demand support.

*Id*. ¶ 9, 26.

Introduced in 2016, the PuraPly product line is one of Organogenesis's best-selling

products nationwide, representing approximately half of the Company's net revenue.  *Id*. ¶¶ 18-

19.  PuraPly works as a physical and antimicrobial barrier to help prevent the accumulation of

bacteria on a wound and support the healing process.  *Id*. ¶ 18.  PuraPly comes in a variety of

sizes and configurations to manage different wound types.  *Id*.

Organogenesis's placental derived human tissue allograft products, including Affinity,

NuShield, Novachor, and Cygnus Dual, are produced from placentas donated by birthing

mothers from their caesarean procedures. *Id*. ¶ 20. These products function as a barrier to support the wound healing process and are intended for use on various types of wounds and anatomical locations. *Id*. Organogenesis's competitors also produce human placental allograft products, including MTF Biologics' AmnioBand and AlloPatch and Amniox Medical, Inc.'s amniotic allograft products. *Id*. ¶ 25.

Organogenesis markets and sells its portfolio of advance wound care products across the United States through territory-based medical sales representatives, who are known as Tissue Regeneration Specialists ("TRSs"). *Id*. ¶ 27. Each TRS is assigned to a "territory" within a larger "region" of the United States and reports to a Regional Sales Manager. *Id*. ¶ 28. Within their territories, the TRSs serve as Organogenesis's primary points of contact with medical clinicians, customers who purchase Organogenesis's products, and prospective customers. *Id*.

Organogenesis relies on its TRSs to develop and maintain strong relationships with medical clinicians and customers and to expand its clientele. *Id*. ¶ 29. To that end, the Company invests significant resources in training its TRSs. *Id*. Such training typically consists of multiple phases, with each phase incorporating at-home and field training. *Id*. TRSs are provided with rigorous home study materials and accompanying assessments that cover topics ranging from the types of conditions that Organogenesis's products treat to key features that differentiate Organogenesis products from other products on the market. *Id*. ¶ 30. Organogenesis also provides training on sales techniques, marketing, reimbursement, and compliance. *Id*.

Through this training and their day-to-day work with customers, TRSs have access to confidential information about Organogenesis's customer accounts and market intelligence, including, for example, customer preferences, purchase histories and patterns, competitive product utilization, practice patterns (*e.g.*, how clinicians utilize skin substitutes), and purchase

power (*e.g.*, credit limits and other limitations). *Id.* ¶ 31. To protect its good will, trade secrets, and confidential information shared with the TRSs, Organogenesis routinely enters into agreements with them that prohibit them from, among other things, (1) engaging in business activity that is competitive with the Company and/or soliciting Organogenesis's customers while employed at the Company and for a period of time after their employment ends; and (2) misusing Organogenesis's confidential information and trade secrets, including, without limitation, customer purchase histories, preferences, practice patterns, and strategies for gaining business from current and prospective customers. *Id.* ¶ 2.

## II.        Goldsby Signs the Agreement as a Condition of Her Employment.

Goldsby joined Organogenesis as a TRS on September 6, 2016. *Id.* ¶ 38. As a condition of her offer of employment, Goldsby executed the Agreement. *Id.* ¶ 32; *see* Compl. Exhibit 1 (hereinafter "Ex. 1"). In it, Goldsby agreed that during her employment and for one year thereafter, she would not (i) "attempt to interfere with or entice away any customer, licensee or employee or consultant of the Company;" or (ii) "participate as a "salesperson or employee of any other business, firm or corporation which is, or by the action of Employee would become, competitive with the Business of the Company." Ex. 1, § 2.2. Amniox Medical, Inc. and MTF Biologics's Wound Care division ("MTF Wound Care") and their placental-based products are specifically listed in the Agreement as competitive with Organogenesis's business. *Id.* § 2.3.

Goldsby also agreed not to disclose outside of the Company or use for own benefit:

> any . . . trade secret or confidential report or other confidential information . . .
> prospect or customer list . . . relating to the Business of the Company o[r] any of
> its prospects, customers, licensees or suppliers, regardless of how such
> Confidential Information was acquired or generated, until the same shall be
> published or otherwise made generally available to the public without restriction.

*Id.* § 6. Goldsby acknowledged that these restrictions were reasonable and that her breach of any of these obligations would "likely result in irreparable injury to the Company." *Id.*

§ 8.  Organogenesis and Goldsby agreed that the Agreement would be governed by

Massachusetts law.  *Id.* § 11.

### III.    Goldsby's Tenure at Organogenesis.

Upon hire, Goldsby was assigned to the Oklahoma City North Territory, which during

her tenure included Oklahoma City, Edmond, and neighboring cities.[1]  Compl. ¶¶ 10, 41.  In

2017, Goldsby was promoted to TRS for her territory.  *Id.* ¶ 39.  Goldsby participated in the

standard TRS training as described above, during which Organogenesis provided her with

confidential information concerning, among other things, its customers and sales.  *Id.* ¶ 40;

Declaration of Abbey Lawson ("Lawson Decl.") ¶ 13.  Goldsby marketed Organogenesis's entire

line of wound care products including Apligraf, PuraPly, Affinity, NuShield, Novachor, and

Cygnus Dual.  Compl. ¶ 42.  For customers in her territory, Goldsby was the primary face of

Organogenesis.  *Id.* ¶ 41.

As a TRS, Goldsby had access to and regularly utilized confidential information about

Organogenesis's customers and prospective customers in the Oklahoma City North Territory and

the Central Area, the larger sales region within which her territory was located.  *Id.* ¶ 45. This

included market intelligence such as customer preferences, purchase histories and patterns,

competitive product utilization, practice patterns (*e.g.*, how clinicians utilize skin substitutes),

and purchasing power (*e.g.*, credit limits and other limitations).  *Id.*; Lawson Decl. ¶ 9.  Goldsby

also regularly engaged in collaborative efforts with other TRSs aimed at enhancing sales

performance and operational effectiveness.  These efforts typically involved discussions related

to account management, strategies for reaching prospective customers, and best practices for

---

[1] In addition to Oklahoma City and Edmond, Goldsby's territory included the cities of Arcadia, Billings, Blackwell,
Braman, Burbank, Coyle, Fairfax, Guthrie, Kaw City, Langston, Marland, Meridian, Morrison, Mulhall, Nardin,
Newkirk, Orlando, Pawnee, Perry, Ponca City, Ralston, Red Rock, Shidler, and Tonkawa.  Compl. ¶ 10.

optimizing sales within existing accounts.  While this collaboration primarily occurred within her own sales region—which included multiple territories—the geographical configuration of the two regions in Oklahoma led to cross-regional collaboration.  As a result, although Goldsby was primarily responsible for sales in the Oklahoma City North Territory, she regularly communicated with Organogenesis representatives across the Central Area regarding account management and client relations.  Compl. ¶ 46.

With the advice of her colleagues and guidance of her supervisors, Goldsby developed strong relationships with some of the largest medical practices in the Central Area.  *Id*. ¶ 47.  Her relationships bore fruit for Organogenesis, and she generated large, recurring orders from customers such as Skin Surgery Center of Oklahoma, Dermatology Associates of Edmond, SSM Dermatology, and Summit Medical Center.  *Id*.  Goldsby was one of Organogenesis's top performing sales representatives nationwide.  *Id*. ¶ 43.  She consistently maintained an above-average number of active accounts and was one of the first TRSs in Oklahoma to develop relationships with and sell Organogenesis products to dermatology practices.  *Id*.  Organogenesis recognized her outstanding performance with its Circle of Excellence award for top sales representative on multiple occasions.  *Id*. ¶ 44.

Notwithstanding these successes, during the latter part of her tenure with the Company, Goldsby was criticized for overly-aggressive sales efforts to benefit herself rather than the Company.  *Id*. ¶ 48.  In March 2023, the Company learned that Goldsby had, on multiple occasions, reached out to customers outside of her territory despite knowing the existing alignments and business partnerships.  *Id*. ¶ 49.  As a result, Organogenesis representatives and management had to spend unnecessary and excessive time mitigating the damage done to the business relationships with which Goldsby had interfered.  *Id*.  Goldsby was instructed not to

solicit or accept any information that was not directly related to the Oklahoma City North Territory and to follow the proper chain of command.  *Id.* ¶ 50.

IV.        **Goldsby Resigns and Immediately Violates Her Agreement.**

On June 24, 2024, Goldsby resigned.  *Id.* ¶ 51.  The same day, Abbey Lawson, Area Director for the Central Area asked Goldsby to meet to discuss active patients and relevant customer hand-off information.  Lawson Decl. ¶ 23.  Goldsby and Lawson met on June 25, 2024 and discussed Goldsby's active accounts, including the key account contacts.  *Id.* ¶ 24.  Lawson took notes on what she learned from Goldsby in order to ensure a smooth transition for Goldsby's former accounts.  *Id.*  ¶ 25.

On June 25, 2024, Organogenesis sent Goldsby an exit letter detailing the terms of her separation.  Compl. ¶ 54; *see* Compl. Exhibit 2 (hereinafter, "Ex. 2").  The exit letter included a copy of her Agreement and explicitly reminded her that she was bound by its terms.  Ex. 2.  It also instructed Goldsby to abide by any and all legal obligations relating to the protection and non-disclosure of the Company's trade secrets and/or confidential and proprietary information. *Id.*  The exit letter also required Goldsby to return all Company documents, property, and information within five business days of her resignation.[2]  *Id.*  Goldsby's employment terminated effective July 8, 2024.  Compl. ¶ 57.

Despite the exit letter's reminder of her obligations to the Company, Goldsby has been violating her Agreement since her resignation by soliciting her former accounts for business and, in some cases, misrepresenting herself as a current Organogenesis employee.  *Id.* ¶ 59. Organogenesis first discovered Goldsby's violative conduct via an email from a current Organogenesis customer, Skin Surgery Center of Oklahoma ("Skin Surgery Center").  *Id.* ¶ 60.

---

[2] Despite this instruction, Goldsby has not yet returned her Company iPad or transferred any Organogenesis-provided credentials back to the Company.  Compl. ¶ 56.

Goldsby worked with Skin Surgery Center for nearly five years and it was one of her largest customers. *Id*. ¶ 63.

On July 22, 2024, less than a month after her departure, Goldsby's former Regional Sales Manager, Vincent Hayes, received a calendar invitation from Skin Surgery Center that was forwarded to Goldby's former email address. Lawson Decl. ¶ 29. Hayes had been monitoring emails sent to Goldsby's Organogenesis email address in order to maintain customer relationships and ensure a smooth transition following Goldsby's resignation. *Id*. ¶ 28. The invitation was for a "sales meeting" organized by Goldsby and New Horizons Medical Solutions ("New Horizons"), a large distributor of products that compete with Organogenesis's products, including those that Goldsby sold. *Id*. ¶¶ 30, 32; Compl. ¶ 11. Skin Surgery Center's Practice Manager, who was invited to the lunch, forwarded the invitation to a colleague and copied Goldsby, seemingly for visibility as the event organizer. Lawson Decl. ¶ 33. The invitation included the text of a message from Goldsby to New Horizons, describing her "seven year[]" relationship with Skin Surgery Center, Skin Surgery Center's work, preferences, and what type of services and products would be most useful to it. *Id*. ¶¶ 30, 34. This message reveals that Goldsby is providing services for or employed by New Horizons and is providing New Horizons with detailed information about her former Organogenesis accounts that she obtained as a TRS. *See id*. ¶ 35. In other words, Goldsby is soliciting Skin Surgery Center's business for herself and/or New Horizons by relying on and misusing Organogenesis's confidential information and in direct contravention of her Agreement.

Goldsby has called on Skin Surgery Center on at least two other occasions. Compl. ¶ 70. Camille Pritchard, the current Organogenesis TRS assigned to Skin Surgery Center, saw Goldsby in the patient area at Skin Surgery Center on September 13 and September 17, 2024. Declaration

of Camille Pritchard ("Pritchard Decl.") ¶¶ 11-13.  On the second occasion, Pritchard was prepared for two patient applications of Organogenesis's PuraPly products.  *Id.* ¶ 14. A nurse brought Pritchard a collagen skin substitute product called Helicoll and asked if Pritchard was there for its application.  *Id.* ¶ 15.  Helicoll competes with Organogenesis's PuraPly products and is marketed and sold by New Horizons.[3]  *Id.* ¶ 16; Compl. ¶ 74.  Pritchard told the nurse that Helicoll was not an Organogenesis product.  Pritchard Decl. ¶ 17.  The nurse apologized and stated that she had mistaken Pritchard for Goldsby.  The nurse then informed Pritchard that they would be applying Helicoll instead of PuraPly.  *Id.*  This shows that Goldsby has successfully sold a competitive product to one of her former Organogenesis accounts.

The evidence of Goldsby's targeting of Organogenesis customers does not end with Skin Surgery Center.  On August 27, 2024, an Organogenesis TRS visited another of Goldsby's former accounts, Dermatology Associates of Edmond ("Dermatology Associates").  Compl. ¶ 78.  When the staff greeted him, they exclaimed that they had seen two Organogenesis representatives in one week—him and Goldsby.  *Id.*  The staff stated that Goldsby had visited them just days before and told them she was selling a new Organogenesis product.  *Id.*  The Organogenesis TRS then explained that Goldsby was no longer employed by the Company.  *Id.* The Dermatology Associates employees expressed their shock that Goldsby had not told them about her departure from the Company as they saw her frequently.  *Id.*  Organogenesis also has learned that Goldsby calls on her former account SSM Dermatology on a regular basis, and SSM Dermatology has been unaware that she is no longer affiliated with Organogenesis.  *Id.* ¶¶ 79-80.

In addition to her sale of Helicoll to Skin Surgery Center, Goldsby also has persuaded her former Organogenesis customer Summit Medical Center to purchase competing products.  *See*

---

[3] *See* NEW HORIZON MEDICAL SOLUTIONS, https://nhmedical.com/services-products/skin-substitutes/ (last visited Sept. 19, 2024).

Lawson Decl. ¶¶ 38-40.  On September 4, 2024, Hayes received another email to Goldsby's Organogenesis email address, this time from Summit Medical Center.  *Id.* ¶¶ 36-37.  In the email, Summit Medical Center informs Goldsby of patient applications of AmnioBand and AlloPatch, two amniotic wound care products produced by MTF Wound Care that are explicitly identified in Goldsby's Agreement as products competitive to Organogenesis's products.  *Id.* ¶ 39; Ex. 1, § 2.3.8.  Goldsby's sale of MTF Wound Care products to her former account Summit Medical Center is a plain violation of her Agreement.  Compl. ¶¶ 83-84.

Organogenesis also believes that Goldsby is continuing to use her Organogenesis credentials to gain access to patient care areas at her former Organogenesis accounts.  *Id.* ¶ 85.  On September 13, 2024, Hayes received an email from IntelliCentrics, a vendor credentialling system used by, among others, Goldsby's former account OU Health Edmond.  Lawson Decl. ¶¶ 41-42.  The email was a reminder to all vendors regarding proper check in and check out procedures.  *Id.* ¶ 43.  Goldsby had OU Health Edmond in her territory for her entire tenure at Organogenesis.  *Id.* ¶ 44.  While employed by Organogenesis, Goldsby used her Organogenesis email address to register for IntelliCentrics credentials to access patient care areas at OU Health Edmond.  *Id.*  The credentials must be renewed annually.  Goldsby last requested reimbursement for IntelliCentrics credentials on March 1, 2024.  *Id.* ¶ 45.  Following its September discovery of Goldsby's active IntelliCentrics credentials, Organogenesis asked IntelliCentrics to discontinue Goldsby's access.  *Id.* ¶ 48.  Still, Goldsby has been able, since her resignation, to rely upon the credentials Organogenesis sponsored for her to access patient care areas at OU Health Edmond and solicit business and/or sell competing products for her own gain.  *Id.* ¶ 46; Compl. ¶¶ 89-90.

## ARGUMENT

This Court should grant Organogenesis's request for preliminary injunctive relief, because (1) Organogenesis is likely to succeed on the merits of its claims; (2) Organogenesis has

suffered and will continue to suffer irreparable harm in the absence of preliminary relief; (3) the

balance of equities tips in its favor; and (4) an injunction is in the public interest. *Get in Shape

Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 198 (D. Mass. 2016); *Corporate

Techs., Inc. v. Harnett ("Harnett II")*, 731 F.3d 6, 9 (1st Cir. 2013) (same four factors apply to

motion for temporary restraining order).

## I.        Organogenesis is Likely to Succeed on the Merits of its Claims.

"The sine qua non" of the four-part inquiry for preliminary injunctive relief "is likelihood

of success on the merits." *New Comm Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir.

2002); *see Boathouse Group, Inc. v. TigerLogic Corp.*, 777 F. Supp. 2d 243, 248 (D. Mass.

2011) ("[l]ikelihood of success on the merits is the critical factor" and, "accordingly, a strong

likelihood of success may overcome a 'somewhat less' showing of another element") (quotations

omitted).  In considering likelihood of success on the merits, the Court "need only determine the

'probable outcomes' of the underlying claims." *Maine Educ. Ass'n Benefits Trust v. Cioppa*, 695

F.3d 145, 158 (1st Cir. 2012).  In this case, success is not merely probable; Organogenesis is

highly likely to prevail on its claims.

### A.  Breach of Contract

Organogenesis is likely to prevail on its breach of contract claim because (1) the

Agreement is a valid, binding contract, (2) Goldsby has breached and continues to breach the

non-solicitation, non-competition, and confidential information provisions of the Agreement, and

(3) Organogenesis has sustained damages from her breach.  *See Get In Shape Franchise, Inc.*,

167 F. Supp. 3d at 198 (citations omitted).[4]

---

[4] This Court should apply Massachusetts law to Organogenesis's claims.  Goldsby agreed to the Agreement's
choice-of-law provision requiring that it be governed under and construed in accordance with Massachusetts law.
"Massachusetts courts give effect to the law reasonably chosen by the parties to govern their rights under contracts."
*Ethicon Endo-Surgery, Inc. v. Pemberton*, 2010 Mass. Super. LEXIS 314, at *10 (Mass. Super. Ct. 2010).

First, the Agreement is a valid, binding contract between Organogenesis and Goldsby. Under Massachusetts law, "a covenant not to compete—including a non-solicitation or nondisclosure agreement—is enforceable only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest." *New Eng. Controls, Inc. v. Pilsbury*, 2018 U.S. Dist. LEXIS 107489, at *11-12 (D. Mass. June 27, 2018) (quotations omitted). The Agreement satisfies these criteria.[5]

The non-solicitation, non-competition, and confidentiality provisions of the Agreement are necessary to protect Organogenesis's legitimate business interests, namely, its customer good will and confidential information. *See Harnett II*, 731 F.3d at 11 ("In the employment context, restrictive covenants are meant to afford the original employer bargained-for protection of its accrued good will."); *New. Eng. Controls, Inc.*, 2018 U.S. Dist. LEXIS 107489 at *19 (protection of confidential information "is a legitimate business interest that may justify a non-solicitation agreement"); *Boulanger v. Dunkin' Donuts Inc.*, 815 N.E.2d 572, 578 (Mass. 2004) ("Legitimate business interests include protection of trade secrets, confidential information, and good will"). "Good will generally applies to customer relationships, and thus, salesmen . . . have the capacity to injur[e] the good will of their former employers." *New. Eng. Controls, Inc.*, 2018 U.S. Dist. LEXIS 107489 at *17-18 (internal quotations, citations and brackets omitted). A former sales representative like Goldsby is in a position to harm Organogenesis's good will because her "close association with [Organgogenesis's] customers may cause those customers to associate [Goldsby], and not [Organogenesis], with products of the type sold to the customer through the efforts of [Goldsby]." *Id.* The Agreement also protects Organogenesis's legitimate interest in preventing Goldsby from using her knowledge of

---

[5] Goldsby's Agreement pre-dates and is therefore not subject to the Massachusetts Noncompetition Agreement Act, M.G.L. c. 149 §24L(b), and is enforceable under Massachusetts common law.

Organogenesis's confidential information—including client purchasing history and key customer contacts—to lure away its existing customers for herself or an Organogenesis competitor.  *See id.* (describing confidential information that a non-disclosure agreement may legitimately protect).

The one-year limitation in the non-solicitation and non-competition provisions of the Agreement is eminently reasonable and within the restricted time periods that courts in Massachusetts have consistently approved for similar agreements.  *See, e.g.*, *Boulanger,* 442 Mass. at 643 (two-year restriction reasonable); *Marine Contractor Co. v. Hurley*, 365 Mass. 280, 290 (1974) (two-year restriction reasonable); *EMC Corp. v. Clesle*, 2016 Mass. Super. LEXIS 124, *8 (Mass. Super. May 13, 2016) (two-year non-solicitation restriction reasonable). Without such restrictions, Organogenesis would have no protection against a former employee like Goldsby who seeks to use Organogenesis's customer information and good will to entice her former accounts away from Organogenesis promptly upon her resignation from the Company.

The evidence detailed above demonstrates that Goldsby has repeatedly and blatantly breached the Agreement.  Goldsby has used the knowledge she gained during her tenure as a TRS to sell the same type of products in the same region to many of the same customers.  The Agreement explicitly bars such "entic[ing] away" and "interference" with customers.  Goldsby's conduct thus falls squarely within the activity from which she agreed to refrain.

Goldsby's breach of her Agreement has resulted in significant and unquantifiable harm to Organogenesis's business, harm that will increase appreciably if Goldsby is not enjoined by this Court.  Goldsby has already succeeded in selling products competitive to Organogenesis to her former customers and the evidence suggests that she will not stop.  *See Corporate Techs., Inc. v. Harnett ("Harnett I"),* 943 F. Supp. 2d 233, 243 (D. Mass. 2013) ("[O]ngoing breaches of a non-solicitation agreement can separately constitute irreparable harm.").  Customers have expressed

surprise and confusion that Goldsby is no longer employed by Organogenesis, suggesting that she is misleading customers into buying competing products. Organogenesis will have to engage in unnecessary and excessive customer management to mitigate the damage Goldsby has caused to its business relationships and, in some cases, to retain its customers' business.

### B. Trade Secret Misappropriation

To prevail on a trade secrets misappropriation claim under both the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq.,* and the Massachusetts Uniform Trade Secret Act ("MUTSA"), M.G.L. c. 93 §§ 42–42G, Organogenesis must show that (1) the information at issue constitutes a trade secret, (2) the plaintiff took reasonable steps to keep the information secret, and (3) the defendant misappropriated the trade secret. *G&L Plumbing, Inc. v. Kibbe*, 699 F. Supp. 3d 96, 105 (D. Mass. 2023). Organogenesis satisfies these elements.[6]

Organogenesis's confidential information, including, without limitation, customer contact information, purchase histories and patterns, preferences, and strategies for gaining business from customers and prospective customers, constitute trade secrets under both the DTSA and MUTSA. *See EMC Corp. v. Pure Storage, Inc.*, 2016 U.S. Dist. LEXIS 189511, *19-20 (D. Mass. Aug. 19, 2016) (collecting cases and listing "confidential customer-related information including customer lists and contact information" as types of information that are "routinely given trade secret protection") (citations omitted). These trade secrets, including "information about key customer decision-makers and their contact information" is "unquestionably valuable" in a "highly competitive market" like the one in which Organogenesis operates. *G&L Plumbing, Inc.*, 699 F. Supp. 3d at 106. This type of customer information is not publicly available.

---

[6] To prevail on its DTSA claim, Organogenesis must also prove that the trade secret-at-issue is "related to a product or service used in or intended to be used in interstate or foreign commerce." *G&L Plumbing, Inc.*, 699 F. Supp. 3d at 105. (quoting 18 U.S.C. § 1836(b)(1)). Organogenesis satisfies this element as it markets and sells its products nationwide. Compl. ¶ 16.

Rather, customers "reveal direct contact information and sensitive details about their business" only to Organogenesis representatives with whom they "develop gradual, trusting relationships." *Id*. at 110.  For example, Goldsby learned through her five-year relationship with Skin Surgery Center that the Practice Manager was the key decisionmaker, her business needs and preferences and her preferred methods of contact.  Lawson Decl. ¶¶ 25-26; 31, 34.  This information was not public nor available to everyone at Organogenesis.  *Id*. ¶¶ 24-26.  Rather, it was revealed to Goldsby based on the good will she built with Skin Surgery Center on behalf of Organogenesis. *Id*.  Such information belongs to the Company and is invaluable to it maintaining it customer goodwill.  *Id.*

Because this private and highly valuable customer information gives Organogenesis a competitive advantage in the marketplace, Organogenesis has expended significant time, expense, and resources protecting this information and taken great efforts to keep this customer information secret.  Compl. ¶¶ 106-107.  Organogenesis's efforts include but are not limited to restricting electronic access to such confidential information to employees that have a business reason to access it and requiring employees with access to the information to sign non-disclosure agreements and restrictive covenants.  *Id.* ¶ 106.  For example, confidential information concerning customers in the Oklahoma City North Territory covered by Goldsby was only accessible to Goldsby, her supervisors, and a few executives with responsibilities for overseeing the Company's sales organization.  *Id.*; *see Optos, Inc. v. Topcon Med. Sys.*, 777 F. Supp. 2d 217, 239 (D. Mass. 2011) (company took reasonable steps to protect its trade secrets where employees signed confidentiality agreements and access to information was limited).

Goldsby misappropriated Organogenesis's trade secrets when she (i) failed to return her Company iPad, which may contain protected customer information; (ii) used Organogenesis

trade secrets to sell and attempt to sell competitive wound care products to Organogenesis's customers for her own personal gain; and/or (ii) used and disclosed Organogenesis's confidential information for the benefit of New Horizons and/or MTF Wound Care, direct competitors of the Company.  For example, Goldsby used the relationship she developed with Skin Surgery Center's Practice Manager as an Organogenesis TRS to organize a sales lunch with Organogenesis's competitor, New Horizons, that was tailored to the Practice Manager's needs and preferences.  *See, e.g.*, *G&L Plumbing, Inc.*, 699 F. Supp. 3d at 107-108 (finding likely trade secret misappropriation where former employee used proprietary customer contact information to solicit one of his former customers away from his former employer).  Without misusing Organogenesis's trade secrets, Goldsby would have had to expend significant time and effort to tailor her solicitation of Skin Surgery Center as she did.  *See* Lawson Decl. ¶ 35.

For these reasons, Organogenesis is likely to succeed on the merits of its DTSA and MUTSA claims.

## II.    Organogenesis Will Suffer Immediate Irreparable Harm if Goldsby Is Not Enjoined and Continues to Solicit Organogenesis's Customers.

Without injunctive relief, Organogenesis faces immediate, irreparable harm that cannot be remedied through money damages alone.  As discussed above, Organogenesis has built a customer base with whom Goldsby established relationships during her nearly eight-year tenure with the Company.  Since her resignation less than three months ago, Goldsby has already solicited (sometimes successfully) several of her former accounts, and her ongoing solicitations—as well as her solicitation of accounts outside her territory for her own benefit while employed by the Company—suggest that she does not intend to stop.  Each of these sales calls threatens harm to Organogenesis through loss of good will, and disclosure of confidential information.  On that basis alone, Organogenesis has already suffered irreparable harm and "[i]t

would be practically impossible to calculate the extent of the damage" to Organogenesis if Goldsby is "permitted to poach h[er] former accounts in direct breach of h[er] agreed-upon non-solicitation provision." *Harnett I*, 943 F. Supp. 2d at 243 (D. Mass. 2013).

Moreover, there can be no doubt that Goldsby is using confidential information she learned during her employment with Organogenesis to solicit and sell competing products to Organogenesis's current accounts in violation of her Agreement. "No matter how hard [Goldsby] may try (assuming [s]he tries at all), [s]he cannot wipe h[er] mind of the confidential [Organogenesis] and client information [s]he learned while employed" at Organogenesis and "will inevitably call upon that information . . . if [s]he is permitted to do business with h[er] former clients." *Id.* This Court has recognized that where a former employee uses confidential information to benefit a direct competitor, the former employer is gravely harmed. *See Marcam Corp. v. Orchard,* 885 F. Supp. 294, 296–97 (D. Mass. 1995) (enjoining former manager involved in top-level discussions regarding product development and sales from working for, and providing confidential information to, a competitor). Organogenesis is therefore entitled to immediate injunctive relief to stem the harm it is suffering at Goldsby's hands.

Furthermore, Organogenesis "will suffer a loss of goodwill among its clients if [Goldsby] is permitted to use and retain its confidential [customer] information." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dewey*, 2004 Mass. Super. LEXIS 222, at *8 (2004). "Massachusetts courts have held that the loss of a company's goodwill results in irreparable harm and is appropriately protected by an injunction." *Id.* (citations omitted); *see, e.g.*, *A.R.S. Servs. v. Baker*, 2012 Mass. Super. LEXIS 43, at *12 (Mass. Super. Feb. 21, 2012) (plaintiff demonstrated an injunction was necessary to prevent irreparable harm where defendant had already contacted two customers and, therefore, plaintiff "face[d] the distinct possibility that it will lose its

goodwill with customers and risk losing those customers to [the defendant's new employer]");

*Schwabel Corp. v. Conair Corp.,* 122 F. Supp. 2d 71, 84 (D. Mass. 2000) ("[T]he loss of market

share and business relationships…may independently constitute irreparable harm [.]").  If

Goldsby is permitted to use her relationships with Organogenesis's customers to entice them

away for herself, New Horizons, or any other new employer, such loss of good will and negative

"market effects [cannot be] fully compensable in money."  *Spalding & Evenflo Cos. v. Acushnet*

*Co.,* 1986 U.S. Dist. LEXIS 17129, at *5-6 (D. Mass. Nov. 28, 1986) (internal quotes omitted);

*Salomon Smith Barney, Inc. v. Barcomb,* 2003 Mass. App. LEXIS 1497, at *4 (Mass. App. Ct.

Jan. 3, 2003) ("[T]he loss of clients which the plaintiff may suffer as a result of the defendant's

solicitation on behalf of his new client would constitute irreparable harm which could not be

adequately compensated in money damages.").  This Court's explanation of irreparable harm in

*Optos* speaks perfectly to the irreparable harm Organogenesis faces from Goldsby:

> The Defendants' actions established a plausible threat of future [] customer
> defections . . . and the damages associated with those defections may escape
> accurate measurement, both because it will be difficult to ascertain whether the
> defections are the result of [the new employer's] solicitation or of other factors, . .
> . and because the defections may affect [the former employer's] goodwill. . . .
> Further, Defendants' actions could undermine [the former employer's] business
> relationships with its customers and erode [its] market share in a limited market . .
> . . These are precisely the types of claims that have been found to independently
> buttress the legal presumption of harm in trade secrets cases.

*Optos,* 777 F. Supp. 2d at 241 (internal quotes and citations omitted).  The harm

Organogenesis faces here is precisely the type of "substantial injury that is not accurately

measurable or adequately compensable by money damages" where injunctive relief should be

granted.  *New Eng. Controls, Inc.*, 2018 U.S. Dist. LEXIS 107489, at *22.  For these reasons, the

evidence supports a finding of irreparable harm and justifies Organogenesis's requested

injunctive relief.

### III.    The Balance of Equities Favors Granting Organogenesis's Requested Relief.

The immediate and unquantifiable harm Organogenesis will suffer if emergency relief is not granted outweighs any harm to Goldsby.  The significant harms to Organogenesis from Goldsby's repeated and ongoing violations of her Agreement are clear.  Indeed, Goldsby agreed at the time of her hire that any violation of the Agreement would cause Organogenesis irreparable harm, Ex. 1, §8, which "is a factor properly added to the scale in weighing the equities," *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 501 (1986).  In contrast, the only "harm" to Goldsby would be honoring the terms of the Agreement she freely signed in exchange for her employment and compensation.  "The injunction would only restrain h[er] from accessing information [and customers] to which [s]he is not entitled." *EMC Corp. v. Arturi,* 2010 U.S. Dist. LEXIS 132621, at *20 (D. Mass. Dec. 15, 2010).  Merely requiring Goldsby to comply with her obligations under the Agreement cannot be viewed as a cognizable harm.  *Id*.; *see Barcomb,* 2003 Mass. App. LEXIS 1497, at *4 (injunctive relief prohibiting a former employee from soliciting clients he serviced or learned of during his employment with the plaintiff was a situation "entirely of the defendant's making, as he freely entered into those provisions of his employment contract").  For all the foregoing reasons, the balance of harm tips decidedly in Organogenesis's favor.

### IV.    The Public Interest Would be Served by Enjoining Goldsby and Protecting Organogenesis's Contract Rights.

Public policy also supports the issuance of injunctive relief against Goldsby.  It is generally in the public interest to "enforce agreements which were voluntarily entered into and accepted," *Shipley Co., L.L.C. v. Kozlowski*, 926 F. Supp. 28, 30 (D. Mass. 1996), and as a "matter of long-standing Massachusetts law, it is beneficial to the public that contracts for the

partial restraint of trade should be upheld to a reasonable extent," *Harnett I*, 943 F. Supp. 2d at 245 (quotations omitted); *see Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 330 (D. Mass. September 24, 2008) (injunctive relief enforcing restrictive covenants "serves the public interest in enforcing contractual arrangements").

This Court has granted preliminary injunctions on facts analogous to those presented here. *E.g.*, *G&L Plumbing, Inc.*, 699 F. Supp. 3d at 110 (preliminary injunction serves the public interest where it protects against former employees "exploit[ing] . . . confidential information [which] could have a chilling effect on customers' willingness to form those relationships"); *New Eng. Controls, Inc.*, 2018 U.S. Dist. LEXIS 107489, at *25 (injunction prohibiting former employee from soliciting former customers serves public interest).

Because "[t]he time-bound non-solicitation . . . obligations in this case" would last for no more than twelve months, they are even "less restrictive than other covenants that Massachusetts courts frequently uphold," *Harnett I*, 943 F. Supp. 2d at 245, and their enforcement would not offend the public's interest in "the free alienability of employees," *Bio-Imaging Techs.*, 584 F. Supp. 2d at 330. Where, as here, the obligation in the Agreement is "designed to protect [the plaintiff's] confidential information and good will, the agreements should be enforced." *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d at 443 (D. Mass. 2010). The public interest, therefore, also supports enforcing the Agreement between Goldsby and Organogenesis.

## CONCLUSION

For the foregoing reasons, the Court should enter a Temporary Restraining Order and Preliminary Injunction to prevent Goldsby from continuing to violate her Agreement.

Dated: September 26, 2024                    Respectfully submitted,

                                            ORGANOGENESIS INC.

                                            By its attorneys,


                                            /s/ Michael L. Rosen
                                            Michael L. Rosen, BBO No. 559954
                                            Laura D. Gradel, BBO No. 692315
                                            FOLEY HOAG LLP
                                            155 Seaport Boulevard
                                            Boston, MA 02210-2600
                                            mrosen@foleyhoag.com
                                            lgradel@foleyhoag.com
                                            Tel: 617-832-1000
                                            Fax: 617-832-7000